I don't know who's on first, but whenever you're ready, you're free to begin. Good morning. May it please the Court. Michael Strube appearing on behalf of Edward Wolkowicz, who is Chapter 7 trustee for Imperial Credit Industries. In that capacity, Mr. Wolkowicz represents the creditors of Imperial. With me at council table is my colleague, Jeffrey Reisner. I hope to reserve five minutes for rebuttal. I'd like to begin by making it clear what we are not asking the Court to do. We are not asking the Court to depart from the teachings of the Fourth Circuit in Inouye First Corp. or the Tenth Circuit in Inouye-Overland Park. What we are asking for is an opportunity to present to a trier of fact the questions that were resolved adversely to Imperial below, based on inferences from the evidence that at every turn were resolved in favor of the trustee. And chief among those is whether the Imperial Board guaranteed the May 9th capital plan of Southern Pacific Bank, which was amended on May 24th. I'd like to turn to that issue first. Before getting into the substance of that issue, I want to emphasize the standard of review. We're here following summary judgment. In applying this Court's decision in O'Connor v. Boeing, which we cite at page 21 of our brief, summary judgment is improper unless the only reasonable inference that can be drawn from the facts is that at its Board meeting on February 27th, Imperial intended to guarantee some capital plan other than the capital plan that was before it. Moreover, the California law, if there are competing interpretations of an ambiguous contract, and if the contract can be construed in a manner that is consistent with the interpretation being advanced by the trustee, then, again, summary judgment was improper. Let me just — is it your — I really do want to hear what you have to say about this. It's important. But I'm curious about how it links on to the bottom line of what's gone on since. Assuming we're correct that this guarantee should never have been construed as it was, does — what happens then? Does the Chapter 7 go away? Do we go all the way back to the beginning and say there never would have been a Chapter 7, or what? No, Your Honor. The case would remain in Chapter 7. The trustee, my client, would try this case, and there would be a factual determination by a trier of fact as to whether, in fact, Imperial intended to guarantee the capital plan. I see. So the issue of whether they had to cure it first and so on is sort of beside the point, because if there's no guarantee, there's no guarantee, and they don't have to — and it doesn't become a claim, and it doesn't have any priority because it's not a claim, and we have to worry about the fraudulent conveyance because it doesn't exist. Is that basically where we are? Absolutely, Your Honor. There is no question here raised on appeal. You're not asking us to unraffle it back to Chapter 11 by saying, well, there never would have been a Chapter 7 at all. No, Your Honor, we are not. And that is why we're not asking for any remedy that is inconsistent with the decisions that are cited by the Tenth Circuit and the Fourth Circuit in First Corp and Oberlin Park. Now, there are two inferences that can be drawn from the evidence concerning the performance guarantee. One inference is that the FDIC made a mistake and failed to obtain a guarantee of the May 9th capital plan as amended on May 24th. The other inference is that Imperial, at its Board of Directors meeting on February 27th, entered into an open-ended guarantee and gave to the FDIC unilateral control over the terms of the capital plan that was going to be approved and for which Imperial would have to pay, the liability under the plan, the date that that plan would have to be complied with, and that the Imperial Board knowingly relinquished any control over its ongoing liability. Now, we believe that the evidence strongly supports the first inference, that the FDIC simply made a mistake. But on summary judgment, of course, every reasonable inference must be drawn adverse to the FDIC. So clearly on summary judgment, there's a disputed issue of fact. Judge Graber, in your opinion, in Chaley Garcia v. United States, made the point that when interpreting a contract, you need to look at the contract as a whole. And so I'd like to begin by looking at the performance guarantee itself. We included this document in the appendix to our brief at page A1. There's some notable things about this performance guarantee. First of all, the top of the guarantee reads, Item C, Performance Guarantee. That's because this guarantee was appended as Item C to the capital plan that was submitted on March 1, 2002, that the FDIC rejected. Another noteworthy aspect of the guarantee, at the bottom, it reads page 13. It reads page 13 because it was attached sequentially to the March 1, 2002 guarantee that the FDIC rejected. I also would note that in paragraph B, the last line has a date, March 1, 2002. That's the guarantee of the capital plan that Imperial thought was applicable, the March 1, 2002 date. Now, there was some discussion below as to whether, because the date does not appear before the word capital plan, does it suggest that the term capital plan is not modified by the date? I think I can clarify that in a minute when we look at the actual board minutes. The actual what, I'm sorry? The board minutes, which we'll look at next. And those are going to be found in the record of the 05 appeal, which is 05-56073. It's volume 2, tab 12, beginning at page 293. And I'm going to turn to those in just a second. But first, I do want to address the two arguments that the FDIC makes. Why isn't there a very simple way of looking at this? It says you have to file a written capital restoration plan, the capital plan. And then you look through the next sentence that says with respect to the company's capital restoration plan. The next one says the capital plan. And one could say they're all referring to a particular capital plan, i.e., the one this is attached to. Otherwise, you'd have something completely open-ended, which seems very strange to me. Absolutely, Your Honor, and that is exactly our position. That the capital plan, capital letters, is the capital plan that was before the board and that the board was not intending to write a blank check and automatically approve on a going-forward basis any prospective capital plan that SPB might later submit and that the FDIC might later approve. Now what the FDIC says is it points to the language in paragraph D, which says that the capital plan is intended to comply fully with Section 38 of the Federal Deposit Insurance Act. Well, there are two inferences that can be drawn from this language. One inference is that's exactly why the guarantee was being entered into, was for the capital plan that was before it, this guarantee was intended to comply with Section 38. The inference that the FDIC would have the Court draw is a much broader one, which is that this reference means that as to any prospective capital plan that the bank might later approve, this guarantee meant that the guarantee would comply with Section 38 for all of those capital plans on a going-forward basis. We submit that that interpretation is not reasonable, but in any event, drawing inferences in favor of the trustee, that clearly is not something that can be resolved on summary judgment. The second word to which the FDIC points is in subparagraph 1A. At the very bottom, there's a line that says fails to comply with its approved capital plan. And what the FDIC says is, aha, what that means is that this guarantee applies to any capital plan that the FDIC later approves. We would submit that the more reasonable inference is that this guarantee was intended to cover the capital plan only if it was approved by the FDIC. That is consistent with... Is that right? The plan had some amount of money that was going to... Yes, Your Honor. The plan contemplated that $55 million in capital would be infused... This is the March plan you're talking about. This is the March plan, yes, Your Honor. And that was what the guarantee was guaranteeing. It was guaranteeing that any deficiency in capital... Would be made up. Would be made up. And that amount was uncertain. Okay. Now, what about the May plan? How much did that say was going to be infused? That plan had a similar amount of money, but from an entirely different source of funding. So you're saying the risk would have been different. The risk was completely different, and moreover, the timing was very short. So as of March, the date by which the capital deficiency was measured would be from March 1 to June 30, 2002. Everything you're saying makes lots of sense to me. What's very disturbing, of course, is that what that leaves is the fact that the May plan didn't have a guarantee and had to have a guarantee in order to be approved. That's correct, Your Honor, which is why the inference is simply that the FDIC made a mistake in not obtaining... Well, and then you fostered it, essentially. I mean, your company and the guarantor and the underlying company were extremely closely related, as I understand it. So it's not as if it is unlikely that the board of directors of your client didn't know exactly what was going on with respect to the May plan. Your Honor, that is, there's no evidence in the record that, in fact, the board of directors did know what was going on. The evidence in the record is that the bank was a wholly owned subsidiary of Imperial. There is no evidence of any correspondence between the FDIC and the Imperial board. This was something that the district court below had hypothesized, surmised. This is an argument that the FDIC makes, but there's absolutely no evidence in the record to support it. In fact, the evidence in the record is that Imperial was not aware of this guarantee at all because, in fact, nothing happened on this guarantee from the date that the guaranteed issue was approved, March, all the way until 49 days after Imperial filed for bankruptcy. That's the first time the FDIC shows up on the doorstep and says, by the way, you guaranteed this plan that we ultimately approved. There's no evidence of any negotiations between Imperial and the FDIC. There's no evidence of anything at all. So while one can surmise one way or the other what the board's involvement was, there's no evidence of it. And on summary judgment, it certainly is inappropriate to assume as a matter of law that Imperial knew about this guarantee. And, in fact— You mean about the later plan. I'm sorry, that it was guaranteeing the later plan. Yes, Your Honor. And, in fact, if we look at the board minutes that considered this plan, and, again, this is in Volume 2 of the 05 Appeal, Tab 12, page 293. The plan at the time was considered the FBR plan because it was a plan that was put together by a company called Friedman Billings Ramsey. And at page 297 of the record, there's a resolution. One of the board members says, with respect to the FBR plan, Director Maloney said that as a matter of process, the board of ICII, which is Imperial, will need to make an informed decision after seeking and reviewing all other alternatives to the proposal set by FBR at this meeting, if there was going to be a later proposal. So it's clear that at the board meeting, the board considered the possibility that there would be another plan and said, if that happens, we want the opportunity to consider it. I did want to address— Well, do you think it's your impression that the board was trying to slip this plan in without a guarantee in spite of the statute? No, absolutely not, Your Honor. What happened was, and, again, if we look at the board meetings, what's clear, and I would ask the Court, look at those meetings, it had in front of it the capital plan, the March 1 capital plan that was defined in the guarantee. And it refers to it by date. And, in fact, the date, and this appears on page 299 of the record. What is the date of the board meeting that you're talking about now? February 27, 2002. You're not talking about May. I think what Judge Hall is asking is, what were they thinking in May with regard to how they were going to get this plan approved without a guarantee? There's no evidence that Imperial was involved at all in getting the plan approved without a guarantee one way or the other. What the evidence is, was that the FDIC did it right with respect to the March 1, 2002 capital plan. It submitted the capital plan. It was considered by the board. There was a guarantee. The guarantee complied with Section 38 of the Federal Deposit Insurance Act. It was submitted with the capital plan. But then what happened is the FDIC rejected that plan. The bank submitted another plan in April. The FDIC rejected it. The bank submitted another plan on May 9. The FDIC rejected it. None of these plans had guarantees. Ultimately, on May 24, the FDIC accepted the capital plan that was being submitted, but it never got a guarantee. There was no guarantee attached to it. It never went back to the board.  The only remaining evidence is that 49 days after bankruptcy, the FDIC said that that initial guarantee applied to all future capital plans that Southern Pacific Bank might later propose. Or it wouldn't have been accepted in any plan. Again, Your Honor, and actually, there is one piece of evidence in the record that discusses this, and these are the notes in an FDIC chronology that was prepared by the Inspector General. And in those notes, it has a date of May 24. And this FDIC document says, SPB's capital plan approved. FDIC to get a guarantee. That is the document... The point that gets obscured here sometimes is that there were actually two corporations, even though very closely related. So the company that was the guarantor was not the company that submitted the plan. It was a different company. It was the parent company. That's correct. The company that was the guarantor submitted the guarantor. That is correct. It was the parent company. That's correct, Your Honor. All right. So go back to my first question, then, in a way. So this is what? It's a separate affirmative lawsuit that is still ongoing. I'm trying to figure out how this fits into the Section 7 because there's been so much water under the bridge since this all began. So if we were to agree with you, what would we do and what would happen? If you were to agree with me, Your Honor, what would happen is that the case would be sent back. There would be an issue. I assume that the FDIC would want to try its argument that this guarantees fraud. Right. So it would try it as an adverse case in Chapter 7? In Chapter 7, yes, Your Honor. And if the FDIC were to prevail, then that claim would be entitled to priority under 507A9. There's an argument about that, but whatever the argument, that's a separate argument. That's a separate argument. That's correct, Your Honor. And if the FDIC were to lose, then it would be simply one of the other unsecured creditors, or the claim would go away completely depending on whether it's a fraudulent conveyance. So this is what this means to the estate is whether unsecured creditors get paid. They would go away completely in your theory without it being a fraudulent conveyance, right, if they lost? If the FDIC – it would go away, Your Honor, because there's no guarantee at all. Right. If there's no guarantee, there's no obligation. And so then the unsecured creditors will get paid. And that's why we're here, because this matters to the unsecured as to whether they see a dime out of this estate. I realize that I'm eating into my rebuttal time, so I will – It's almost gone. I would like to reserve the remainder for rebuttal. Okay. You have it. Thank you. Are we all here? I'm not going to address any of the other issues. Did you want to – one moment. Did you want to ask him about some of the other questions? I'm concerned about some of the other issues. We're going to ask – sorry about this. We're going to ask Mr. Strube to return in spite of the fact that he's used a lot of his time, because Judge Hall has some additional questions. Thank you. Sorry for the – sorry for the ring. Happy to do so, Your Honor. I would like to hear you on the problem of the fraudulent conveyance. I find that one of the most difficult issues in this case. Yes, Your Honor. Let me begin by pointing out there was an issue as to which the Court asked for supplemental briefing, and that was whether the fact that the – that Imperial had converted to a Chapter 7 rendered moot the issue of whether the bank had to cure – whether Imperial had to cure in order to bring a fraudulent conveyance defense. And there is a statement in the letter brief that was filed by the FDIC that is, in fact, flatly inaccurate. What the FDIC says is that what happened below was that Judge Selma dismissed Imperial's fraudulent conveyance defense on alternative grounds. One was under Section 18U of the FDIA, and the other was because it was a trustee defense that Imperial was required to cure before asserting that defense. That's not accurate at all. But you're not actually contesting, as I understood the first thing you said when you got up today by saying that you weren't contesting first course, that you're not contesting that there was an obligation to cure if there was a guarantee. With respect to the fraudulent conveyance defense, Your Honor, though, that issue isn't before the Court at all. We're not contesting that – it's simply not a part of anything that's been raised on appeal. We're not contesting that in order to go through Chapter 11, Imperial was required under Section 365O to cure. The statute says, deemed to have assumed. So when the petition was filed, it was deemed to have assumed and shall cure. This issue is slightly different, which is, was Imperial required to cure as a condition to defending against the performance guarantee on any ground? And below, the Court said, no, no cure was required in order to assert contractual defenses. The Court also said that a cure would be required to assert what it called trustee defenses. And it was referring to an equitable subordination claim that was live. What it was not referring to, with respect to that holding, was the fraudulent conveyance defense. Because what happened below was that in its initial order in August of 2004, Judge Selma held that Imperial could not assert a constructive fraudulent conveyance defense because that defense was barred by Section 18U of the FDIA. But if we disagreed with that, then we'd have the other problem. No, Your Honor. You would not because we're now in Chapter 7. So it – and what – and if you look – and this could not possibly be clear, which is – And in Chapter 7, you could assert the fraudulent conveyance defense, but you haven't. Absolutely, Your Honor, because – You haven't. We have not yet because what – right now, we have appealed it. I thought you said that you've actually forgone it. You've essentially agreed not to assert any defenses. No, Your Honor. That's not the case. that because Judge Selma dismissed the fraudulent conveyance defense in his August 2004 order, which was part of the appeal, on the basis that whatever chapter you're in, in order to assert that fraudulent conveyance defense, you can't assert it against the FDIC because it's barred by 18U. That decision by Judge Selma in August of 2004, it doesn't matter whether the trustee is asserting that defense in Chapter 11. You're basically saying that your agreement not to assert any defenses was essentially not to assert any additional defenses, that this one was already by the boards as far as Judge Selma was concerned and you needed to reverse that before you could make a decision whether to reassert it essentially. Absolutely, Your Honor, because Judge Selma had already held that the trustee couldn't assert a fraudulent conveyance defense under 18U. There's no point in, after conversion, the trustee going back and saying to Judge Selma, did you really mean what you said? In any event, at that point, we'd appealed the decision. In our view, Judge Selma was divested of jurisdiction on that issue regardless of the chapter in which the case was in. Also, let me just make one comment on the characterization of the stipulation. What happened was when Judge Selma held that this claim was entitled to priority under Section 507A2, we, the trustee, had one defense remaining and that was equitable subordination, which we elected not to pursue that defense. We gave it up. And so that rendered the case final because the concern that everybody had, Judge Selma and the parties, quite frankly, was we had one appeal of partial summary judgment and then the 12B6 ruling with respect to the 18U claim, the constructive fraudulent conveyance claim. Then we would have another appeal of a priority issue. And we'd still have below the equitable subordination claim. So we have sequential piecemeal appeals. We elected not to pursue the equitable subordination claim. We released that claim. That rendered the case final for purposes of appeal. That was the nature of the stipulation. It wasn't as if there were other defenses waiting in the wings. Do you have any questions, Judge Osler? Thank you, counsel. Thank you, Your Honor. Now it's your turn. May it please the Court. I'm Scott Watson with the FDIC's Legal Division. With me today are Michael Bierman and Jennifer Barozzi, all on behalf of the FDIC. I will get into, I guess, now two issues. The first is the threshold issue of whether Imperial entered into a binding performance guarantee. And I'm going to demonstrate that they did. In doing so, I'm going to address four points that they made during their opening argument that are just not correct. The first is that the record shows no evidence of Imperial being involved subsequent to March 1st. That's not correct. The second is that there was the creation of an open-ended obligation. That's not correct. The third is that the FDIC set the liability, and that's why Imperial wouldn't have been entering into a performance guarantee. That's not correct. And finally, that Imperial gave up control of its wholly owned subsidiary. That's also not correct. I then will address the fraudulent conveyance issue, both procedurally, why it's not properly before this Court and was dismissed, and then substantively, why 1828U would bar that fraudulent conveyance claim. As to the record, let me just go to that first, because there was a constant assertion that Imperial was not involved. Imperial ended its involvement on February 27th. Well, let's start. I mean, that becomes kind of a question of are there strong equitable reasons essentially to read this contract or this guarantee somewhat creatively. But if we were to read it non-creatively, i.e., looking at simply what it says, I find it hard to believe that you would read it as applying to a capital restoration plan that didn't exist at the time. I mean, for one thing, people, you know, that's not a strange kind of a guarantee, but also just the language of the guarantee itself talks about a written capital restoration plan, the capital plan that it talks about with respect to the company's capital restoration plan, and so on. And all the way through, there's no indication of an intent to do something open-ended. And it is open-ended because this was rejected, and one doesn't know what was going to be accepted. And what was accepted was something quite different, as I understand it. Respectfully, Your Honor, I have to disagree with that characterization, because what the performance guarantee guarantees is it guarantees the written capital restoration plan of the bank in response to the February prompt corrective action notice. And any plan they submit at any time. The plan that they had to promptly submit to the FDIC. And what they were submitting... By March 1st, and I did the guarantee of that one, but that wasn't a plan that was approved. But, again, respectfully, I don't believe that they were, I think that finding that March 1st delivery date, which follows the parenthetical describing the written capital restoration plan, does exactly what occurred here, which is it describes a written capital restoration plan responding to the FDIC's notice, and as part of an entire statutory and regulatorily required process. When they signed something... If this were a third party, you know, completely unrelated company, and this was the guarantee, do you think there's any chance that you would read it as saying that we are going to guarantee something we've never seen, don't know what it is, and anything it is that they in the FDIC eventually agree as we guarantee it? I think that would be a different circumstance. But if there was a statute telling them that they were... Who's the them? The them is... Telling Imperial. But in this case, what we have is a statute telling Imperial it cannot, that it is obligated by statute, it shall provide a written guarantee. Okay. And informing Imperial... And the FDIC may have done that. But bureaucrats don't screw up when the regulations that they acknowledge in recitals C and D, they recognize that there's a statutory process involved, and the regulations implementing it that are referred to right there in the performance guarantee expressly acknowledge an approval process and the potential for revisions of plans. Does the regulation run to the parent, the holding company? It's expressly referred to in the performance guarantee itself, and the statute requires that there won't be an approval of a performance plan unless there is a performance guarantee from the parent, from any controlling company. So that's Congress's judgment right in the statute, and then it's fully implemented in the regulations. But when they say, when they suggest that they were not involved subsequent to that, I would direct the court to page 118 of the record, where Southern Pacific Bank informed the FDIC in May as part of the ongoing revision of the plan that was being provided in response to the February prompt corrective action notice. It said, the boards, plural, of directors of the bank and its sole shareholder, Imperial Credit Industries, met for most of the day on Wednesday, May 1st, to consider the alternatives available to the bank. Imperial was the sole shareholder of Southern Pacific Bank. Imperial, as part of a legislative and regulatory scheme that finds prompt corrective action is necessary, the bank must respond very quickly. In this case, within a month, they had to submit a written capital restoration plan. Before they could do so, there had to be a guarantee in place. What did Imperial do? Imperial acknowledged that that February 1st letter had set out the prompt corrective action notice. It said that among the provisions of the statute and the regulations are the requirement that a company that controls an undercapitalized bank issue a performance guarantee. The guarantee set forth below, the only guarantee they signed, is intended to comply fully with Section 38 of the FDI Act and the implementing regulations thereto, implementing regulations that called for an approval process and that recognized potential revisions. It's our position that there's no genuine issue of material fact, and that there isn't a question of fact here, that it's appropriate under California law and the decisions of this court to find that there's only one reasonable interpretation of that contractual language. The reasonable interpretation was the intent that they described to comply fully with the law. In this court's decision in the student loan case, which we cited, the court recognized that when you're entering into a contract with the government, that you have to analyze that contract with respect to the legislative scheme and background against which the contract is drafted. California law requires that you can't, or allows, and in some cases mandates, that you look at the surrounding circumstances to determine whether there are alternative reasonable interpretations. And in this case, the district court properly found, and we submit that you should as well, find that there's only one reasonable interpretation, and that is that they intended to follow the statute and follow the regulations and guarantee. At the time they entered into this, they couldn't have contemplated whether there was going to be another plan after the first plan, right? They didn't know the first plan was going to be rejected. They didn't know there was going to be another plan. They didn't know what was going to be in the other plan. Are all those facts correct? I don't believe it's correct that they didn't know what would be in the other plan. March 1st? At the time they entered into this guarantee? They were guaranteeing the written capital plans that plan that would be submitted or revised by their wholly owned subsidiary. That Southern Pacific Bank isn't an independent actor here. With what limitation? I mean, in terms of time, in terms of amount, in terms of what? Nothing? Well, the limitation is set in the statute, the regulation, and in the language of the guarantee. They're just wrong when they say it's open-ended. What is it? The limitations are twofold. There's a limitation on the amount of liability. The amount of liability, if you look at guarantee 1a, it's on the first page of the performance guarantee. It's either 5% of the company's total assets as of December 31st, 2000, or the amount which is necessary or would have been necessary to restore the relevant capital measures of the company to the levels required. In prompt corrective action, what was going on here is that the bank had become undercapitalized. There are capital measures that are set forth in the regulations. They had fallen below that, and the FDIC informed them in February, you are now undercapitalized. You must provide prompt corrective action. The action requires a guarantee from your parents, your parent company, that you will meet your written restoration plan and provide to us a written restoration plan. The regulations contemplate that that plan needs to be approved by the FDIC and might be revised. But the guarantee, as you described, and this may be very important, is actually not in an amount determined by the plan in any way. Is that right? The plan dictates how the bank intends to recapitalize. But not the level that they were guaranteeing, that's correct. That is independent of the plan. That's correct, Your Honor. And that was to avoid the consequences of being undercapitalized. We would submit that the only reasonable interpretation of this contract is what actually occurred here, which is a February prompt corrective notice went out. It said you're undercapitalized. You have to provide us a plan. But there must be a guarantee from the parent. The parent entered into a guarantee as to the written capital restoration plan we submit that would be given by Southern Pacific Bank in response to the February 1st notice. Southern Pacific had to get recapitalized. It then suggests that we submit that the plan would be provided by March 1st, 2002. That was the date the FDIC said you've got to get a plan to us. But the guarantee wasn't solely of a March 1st draft, and that would be all. That would be a workless guarantee of a draft that might not be approved. They were, we submit, reasonably agreeing by their declarations in B, C, and D to satisfy the prompt corrective action statute and to guarantee the written capital restoration plan that was being submitted in response to the February notice. Counsel, before you run out of time completely, could you turn to the fraudulent conveyance issue that you foreshadowed in? I can, Your Honor, and I'd like to. I believe, one thing I have to respond to is the declaration that what we said in our letter brief was false. I don't believe it is. What we said is that because there were alternative arguments regarding whether the fraudulent conveyance, because there are alternative arguments available to us, that neither is moot. And that this, the absence of trustee defenses being available to an obligor thanks to 365-0, that that as an alternative basis remains an issue that is not moot. I find that hard to understand because they're now in Chapter 7. They can assert the same defense in Chapter 7. So what's the difference whether they could have addressed it in Chapter 11? What difference does that make? Procedurally, we disagree with them. Well, even if you disagree or disagree that they actually can, they conceptually could. Conceptually, in Chapter 7, a fraudulent conveyance could be raised. Right. But in a case like this, in any case like this, where they have stepped into Chapter 11 and have failed to satisfy their cure obligation, until they satisfy their cure obligation, the trustee defense of fraudulent conveyance isn't available. They're willing to forego that, which is what I hear them saying. They're willing to say, you know, if we don't prevail on our 1838U fraudulent conveyance theory, you know, we're not going to worry about whether we could have interposed this in Chapter 11. We're going to interpose it in Chapter 7 or not at all. Then what difference does it make to you? It makes a difference to us in this case because the Chapter 7 trustee did not assert a fraudulent conveyance defense. You guys can fight about that later. I mean, they seem to think they still can. They can fight about it later. But that shouldn't be fought about later because they didn't assert it. And on the record, before this Court, it's not properly before this Court. No, it isn't. Right. Okay. And because the fraudulent conveyance issue is not before this Court and because they entered into a binding guarantee and under the operation of Section 365.0, and what I heard during the opening argument is essentially they're not contesting the operation of 365.0 or the analysis of the first court decision. Under that analysis and under the operation of 365.0, as we've demonstrated to this Court, the unsatisfied cure obligation that was imposed immediately upon filing in Chapter 11 is in the nature of an administrative expense. And as we have explained to this Court, having converted to Chapter 7, it doesn't alter their obligation as an administrative expense. Well, but that's a separate issue whether that's true or not. And that I'd like to hear a little bit about, too. But that doesn't, I don't see what that has to do with whether they can assert the fraudulent conveyance defense. Why it matters now whether they were able to assert the fraudulent conveyance defense in Chapter 11. It doesn't matter. It doesn't matter now. The issue of whether the Chapter 11 trustee was able to assert it wasn't mooted by the conversion, but because they've dismissed their case and it's not properly before this Court, it is no longer a valid issue. Where I started to say we disagree with the trustee, they raised on appeal, in an interlocutory appeal, the issue of fraudulent conveyance that was not properly before this Court in the 05 decision. It's not interlocutory anymore. Correct. I'll concede that, Your Honor. But the Chapter 7 trustee did not assert a fraudulent conveyance as Chapter 7 trustee. Because they had already lost it, so why do it again? And he thinks it's open on remand if there is a remand. But I don't know why we have to deal with it. I'm still having a hard time understanding what difference it makes to anybody now whether or not in the Chapter 11, the trustee could have raised the fraudulent conveyance issue. The specific issue now that we're in Chapter 7 of whether the Chapter 11 trustee could assert trustee defenses is no longer... It's moot, right? It's been superseded. It has been superseded by filing in Chapter 7. However, well, if you'd like, I can turn to the merits of 1828U and why the fraudulent conveyance claim should not be... And the district court did decide the 1828U. I mean, even if it was suggesting somewhat that he didn't see it as a trustee defense because he did decide it. On your theory, he should never have decided it. On the theory, he didn't need to decide it. But I think any review of the record shows that in June of the preceding year, he decided that the fraudulent conveyance claim was barred by 1828U. Then on February 15th, in his February 15th order, the district court said, trustee defenses are unavailable. And then in a footnote said, of course, because I've already decided that, I'll consider that issue moot and just apply it to the equitable subordination. But the analysis, I think it's clear from reviewing the February 15th order, that the district court believed its analysis also applied to the fraudulent conveyance claim as a trustee defense. And that, of course, is important to the FDIC because it would undermine the cure obligation if trustee defenses were available prior to the cure, as we argued. But even the cure doesn't really matter now because they didn't cure and they were on Chapter 7. So I would like to hear Judge Graber had a question, and then after that I'd like to hear briefly at least about the priority question. No, I'm done asking. All right. Well, then I'd like to hear about the priority question. I mean, that is, why is this an administrative claim instead of a subsection 9 claim? The only way to give effect to all of the terms of 365.0 is to find that there is, upon filing in Chapter 11, automatically an assumption of the obligation under the performance guarantee. You end up with this weird anomaly, which is that, I mean, essentially your cure, the cure obligation makes the guarantee a super priority. I mean, higher than administrative expenses, right? Because you can't do anything until you cure it. Congress imposed an immediate cure obligation. Right, right. So it's a super priority, essentially. All right. And it's plain that it doesn't apply in Chapter 7, that super priority, right? Yes. It's imposed in Chapter 11. And it's also plain that if they had filed a Chapter 7 to begin with, it would be a subsection 9 priority. Yes, Your Honor. All right. So why do we have this strange business that because they filed it as a Chapter 11, and at that point it really wasn't an administrative priority, it was a super priority, and then didn't meet it but instead converted to Chapter 7, which they were allowed to do, why aren't they just in Chapter 7 like anybody else in Chapter 7? They don't have this problem anymore. Because Congress set out a plan that placed those obligations on any parent in this case that filed in Chapter 11. But they're not in Chapter 11. But Congress, by placing it in Section 365.0, which deals with assumption and cure obligations, Congress expressed its policy that upon filing in Chapter 11, there was an immediate obligation to cure, and by placing it in Section 365, those cure obligations are administrative expenses. And the sanction for which it can't be in Chapter 11, go to Chapter 7, and that's what happened. But, Your Honor, it would defeat the immediate cure obligation that Congress imposed if the conversion to Chapter 7 had the effect of erasing the decision to proceed in Chapter 11. Congress said you do have a choice, but if you elect to go in Chapter 11, you've got an immediate cure obligation before you can proceed. And this Court has recognized that Chapters 11 and 7 are different. Right. So they couldn't proceed, and they went to Chapter 7. They couldn't proceed, but by filing in Chapter 11, they had an immediate cure obligation, which is in the nature of an administrative expense, and administrative expenses upon conversion to Chapter 7, their character doesn't change. They're still administrative expenses. What's the general definition of an administrative expense? The general definition. How would you describe an administrative expense? I'm not sure I have a comprehensive answer. Are there cases that tell us what that means? There are cases that tell us what that means, but the administrative expense, the cases that are germane here are how to treat a cure obligation that hasn't been satisfied. And if you have a cure obligation that hasn't been satisfied, that will be treated as an administrative expense. What's your best case for that proposition? We've cited to them in our brief both in-ray coastal trading. In-ray coastal trading deals not only with the administrative expense, but the administrative expense's survival upon conversion to Chapter 7. Was that an administrative expense? Was that a cure 365-0? That was a resulting deficit from an executory contract that had been assumed, yes, Your Honor. But not this. This is a cure obligation following Congress's mandate that Imperial immediately assumed its obligation under the performance guarantee and immediately had a cure obligation. The first court decision addressed this and explained why the result of Congress's use of 365-0 and use of each of the elements, immediate assumption, immediate cure upon filing in Chapter 11, and the use of the words subsequent breaches and a 507, a different priority under 507, that Congress elected to make admission to Chapter 11, to make immediate cure a ticket to admission. And having elected to go in Chapter 7 ---- And making it an administrative expense priority. In-ray coastal trading addresses why unsatisfied cure obligations are treated as administrative expenses. Coastal expenses was about one of these guarantee plans that had to be cured. It is not an FDIC performance guarantee plan, but rather it is under Section 365-0 a remaining deficit on a cure obligation. Do you have any other questions for the counsel? Thank you. Thank you, Your Honor. I appreciate your time. And we will give you one minute for rebuttal. We kept you a long time earlier, but I'll give you a little bit of time now. Thank you, Your Honor. I did want to address the Court's question. Judge Graber, you asked about what an administrative expense is. That's defined in Section 503 as the costs that are necessary for the preservation of the estate. And that's precisely why this is not an administrative expense. The coastal trading case stands for the proposition that in a general sense, executory contracts, if assumed and breached, are administrative expenses. Why? Because they're costs necessary for the preservation of the estate. This is different. This is a deemed cure. It is not payable. Therefore, there was a conversion to Chapter 7, and Congress expressly says within Section 365-0 that you go to 507A9, that that's the priority. I also wanted to point out that the FDIC would have the power to compel an involuntary Chapter 11. So if the FDIC were right, they could force an administrative expense on the estate by forcing a Chapter 11 with other creditors. Thank you, counsel. Thank you, Your Honor. Your arguments, they've been very helpful. We submit this case and are adjourned for this session. All rise. This court is adjourned. Thank you. Thank you.
judges: Hall, Graber, Berzon